**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
PAUL COTTERELL,

               Plaintiff,

       -against-

JAMES GILMORE, WILLIAM HASTBACK,
SUSAN RITCHIE, and JOHN AND JANE
DOE (said names being fictitious, the persons
intended being those of aided and abetted the
unlawful conduct of the named defendants),

               Defendants.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-cv-3808 (ADS)(GRB)

<u>**APPEARANCES:**</u>

**Maduegbuna, Cooper LLP**
*Attorneys for the Plaintiff*
30 Wall Street
8th Floor
New York, NY 10005
   By: Samuel O. Maduegbuna, Esq.
      David A. Beach, Esq.
      William W. Cowles, II, Esq., Of Counsel

**New York State Attorney General's Office**
*Attorneys for the Defendants*
120 Broadway, 24th Floor
New York, NY 10271
      Eva L. Dietz
      Ralph Pernick
      Assistant Attorneys' General

<u>**NO APPEARANCES:**</u>

*John and Jane Doe (said names being fictitious, the persons intended being those who aided and abetted the alleged unlawful conduct of the name defendants)*

**SPATT, District Judge**.

      On August 1, 2012, the Plaintiff Paul Cotterell (the "Plaintiff"), then an employee of the

non-party New York State Department of Environmental Conservation ("DEC"), commenced

this action against the Defendants James Gilmore, William Hastback, and Susan Ritchie (the "Defendants") and certain John and Jane Does.  The Defendants were at all relevant times employees of DEC.  The complaint alleges employment discrimination on the basis of race, color, and national origin under 42 U.S.C. § 1983, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, and the New York State Human Rights Law as contained in New York State Executive Law § 296 *et seq.* (the "NYSHRL").  The Plaintiff also contends that the Defendants caused or perpetuated a hostile work environment against him on the basis of race, color, and national origin and unlawfully retaliated against him for complaining about the alleged unlawful conduct.  Of note, however, the Plaintiff does not assert a "failure to promote claim" or a "constructive discharge" claim, or a claim against DEC under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17.

Following discovery, on August 25, 2014, the Defendants moved, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, for summary judgment dismissing the complaint.

For the reasons set forth, the motion is granted in part and denied in part.

## I. BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements and attached exhibits and are construed in a light most favorable to the non-moving party, the Plaintiff.  Triable issues of fact are noted.

A.  The Parties

The Plaintiff's color is black, his race is black, and his national origin is Jamaican.  He has been employed by New York State for more than twenty years.  In particular, he was employed by DEC between May 12, 2011 through September 12, 2012.

The Defendants, each white, were employed by DEC during the entire period that the Plaintiff was similarly employed. Each defendant was stationed in DEC's East Setauket office. In particular, during this time, Gilmore was employed by DEC as the Chief of the Bureau of Marine Resources; Hastback was employed by DEC as Acting Shellfisheries Section Head and reported directly to Gilmore; and Ritchie was employed by DEC as Food Inspector 2 in the Shellfish Inspection Unit and reported directly to Hastback. Ritchie was the Plaintiff's immediate supervisor from the beginning of his DEC employment until July 31, 2012, when he was "temporarily reassigned" to report to Lisa Tettelbach.

In the Shellfish Inspection Unit during the time that the Plaintiff was employed by DEC, there were only two other Food Inspector 1s, Peter Usbeck and William Athawes, both white. Athawes began as a Food Inspector 1 in 1998 and Usbeck began in 2000. None of the Defendants interviewed or hired them.

B. The Plaintiff's Work History

The Plaintiff was previously employed by the New York State Office of General Services ("OGS) from 2004 to 2010 as a Food Inspector 1.

DEC hired the Plaintiff as a Food Inspector 1 in the Shellfish Inspection Unit of the Shellfisheries section of DEC's Bureau of Marine Resources to fill a vacancy created when another Food Inspector passed away in January 2011.

The Shellfish Inspection Unit's core functions consist of protecting public health through sanitary and records inspections of shellfish shippers and processors, and also by conforming with the minimum inspection frequencies specified by the National Shellfish Sanitation Program so that approximately 250 shellfish shippers and processors can be allowed to sell their shellfish products in interstate commerce.

DEC hired the Plaintiff from a Civil Service preferred list, on which he was the only person listed. Accordingly, apparently DEC had no discretion as to whether or not to hire the Plaintiff for the position of Food Inspector 1.

Throughout his DEC employment, the Plaintiff was stationed at DEC's office in East Setauket, Suffolk County, approximately 116 miles from the Plaintiff's residence in Dutchess County. The Plaintiff's annual salary from DEC was at the high range for the position of Food Inspector 1, ranging from $51,268 to $65,190.

In or about April 2012, eleven months after the Plaintiff began working for DEC, the Plaintiff took the first steps to search for other employment, even if for less compensation. In the course of this search, the Plaintiff found a civil service posting dated July 3, 2012 for a Food Inspector I (Grade 18) position with the New York State Department of Agriculture and Markets ("A&M").

The civil service posting required persons interested in bidding for the position to send a memorandum within ten days after the posting date. The Plaintiff responded to the posting before he received a DEC July 27, 2012 notice of intent to temporarily reassign and before he received a DEC August 3, 2012 notice of discipline, both later described in detail. The Plaintiff applied for the A&M position. He was interviewed, and was informed by a letter dated August 31, 2012 that he received the position effective September 13, 2012. Thus, the Plaintiff had no "break in service" between his September 12, 2012 resignation from DEC and the commencement of his A&M employment on September 13, 2013.

The Plaintiff's starting annual salary at A&M was approximately $65,000, and the Plaintiff also received a $3,096 geographic location pay from both DEC pursuant to a collective bargaining agreement, and from A&M. In addition to receiving the same annual salary from

both DEC and A&M, the Plaintiff also received the same amount of geographic location pay.

The Plaintiff's commute from his Dutchess County residence to his A&M position in Kings

County was shorter than his commute from his residence to DEC in East Setauket. The

Plaintiff's hiring by A&M, effective September 13, 2012, was subject to a probationary period of

no more than 52 weeks and the Plaintiff has continued working to the present for A&M as a

Food Inspector 1.

## C. DEC's Non-Discrimination Policy

DEC maintains a policy of nondiscrimination in the workplace that seeks "to ensure that

Department employees have a workplace that is free from illegal discrimination" and that

"prohibits retaliation against individuals who inquire about his or her rights or who makes a

complaint of illegal discrimination." (Combined Rule 56.1 Statement, at ¶ 35.) This

nondiscrimination policy sets forth internal complaint procedure, advising employees that

discrimination complaints could also be filed with the EEOC or New York State Division of

Human Rights, although "employees are encouraged to raise such concerns with the appropriate

supervisor or the OAA [Office of Affirmative Action]." (Id. at ¶ 36.)

## D. The Alleged Discriminatory Conduct

### 1. The Failure to Notify the Plaintiff of his Hiring for more than Two Weeks After his Interview

On April 25, 2011, the Plaintiff was interviewed by Hastback and Ritchie. The Plaintiff

had stated in his DEC employment application that he was not available to begin work until May

3, 2011. The Plaintiff's DEC employment began on May 12, 2011. The Plaintiff maintains that

his DEC employment should have begun on May 3, 2011.

The Plaintiff alleges that Hastback and Ritchie informed him that he would be notified of

his hiring within a day of his interview. The Plaintiff alleges that by not informing him of his

hiring immediately, he was treated less favorably than applicants Athawes and Usbeck, both white, who were officially informed of their hiring sooner relative to their start date.

2. <u>The Failure to Receive a Welcome Letter</u>

The Plaintiff also alleges that, in a display of discriminatory animus, and contrary to the custom and practice as to incoming hires at DEC, the Plaintiff did not a receive a welcome letter from anybody at DEC until several months after his employment commenced.

However, the summary judgment record indicates that, on May 13, 2011, the day after the Plaintiff's DEC employment commenced, Ritchie sent an email to all DEC employees at "Marine-Long Island," asking them to stop in his office to welcome the Plaintiff. On the other hand, Gilmore apparently did not welcome the Plaintiff as he had done with previous subordinates.

Sometime thereafter, DEC sent him a letter confirming his appointment with DEC and welcoming him to the agency. The Plaintiff maintains that, unlike with respect to Athawes and Usbeck, he did not receive the letter until a month subsequent to its written date.

3. <u>The Failure to Evaluate the Plaintiff's Inspections</u>

The Interstate Shellfish Sanitation Conference ("ISSC") is a federal-state-industry cooperative body that is composed of state shellfish regulatory officials, industry officials, the FDA, and other federal agencies. The ISSC provides the forum for state regulatory officials to establish uniform national guidelines and to exchange information regarding sources of safe shellfish and to ensure that shellfish will be safe and sanitary. An inspector's standardization is for a five-year period.

According to the complaint, Ritchie prevented the Plaintiff from becoming ISSC-compliant because Ritchie refused to evaluate the five inspections performed by the Plaintiff.

The Defendants dispute this allegation and deny that it rose to the level of an "adverse employment action" as is necessary to state a claim under certain federal and state anti-discrimination statutes.   Further, as admitted by the Plaintiff, the New York State Department of Civil Service's description of the Food Inspector I position made no reference to the ISSC or to ISSC standardization requirements; the Plaintiff's performance standards did not refer to ISCC standardization; the notice of intent to temporarily reassign the Plaintiff made no reference to ISSC standardization; and the notice of discipline issued to the Plaintiff made no reference to ISSC standardization.

     4.  <u>The Reinspection of Shippers Inspected by the Plaintiff</u>

The Plaintiff contends that he suffered "ridicule" and "great embarrassment" because the other Food Inspector 1s surreptiously reinspected suppliers that the Plaintiff had already inspected. (Compl., at ¶ 29(f).).  However, the summary judgment record indicates that reinspections were apparently a "two-way street," as the Plaintiff inspected some facilities that had already been inspected by the other two Food Inspector 1s.

     5.  <u>Sick Leave</u>

Section 3.5 of DEC's Time and Attendance Manual states, in pertinent part: "In accordance with Civil Service Time and Attendance rules and Collective Bargaining Unit Agreement, the employee's supervisor may require satisfactory proof to justify the use of sick leave credits.  Such evidence may include a doctor's certificate, proof of hospitalization, etc." (Combined Rule 56.1 Statement, at ¶ 250.)

During the Plaintiffs' first seven months of his DEC employment, from May 12, 2011

through December 21, 2011, the Plaintiff took 100.5 hours of seek leave. In so doing, the Plaintiff sought medical attention for, among other problems, the possibility of having breast cancer.

By contrast, during the same period, Usbeck did not take any sick leave and Athawes took only 6.5 hours. Further, the Plaintiff's absences became more frequent over time. However, the Plaintiff notes that while he took 49 hours of vacation during this time period, Athawes and Usbeck took 108.5 and 107.5 hours of vacation, respectively.

Nevertheless, prior to May 18, 2012, due to his sick leave absences, the Plaintiff was asked to provide medical documentation, apparently by Ritchie and with input by Hastback. The Plaintiff maintains that he was the only employee in his unit required to divulge medical information. According to DEC policy, employees are not required to provide a note until after they have been placed on "medical notice." Yet, the record shows that the Plaintiff was placed on medical notice sometime on or after May 18, 2012.

At some point, Ritchie began to deny some of the Plaintiff's sick leave requests. The Defendants maintain that some of the Plaintiff's sick leave requests were denied because of the adverse effect his absence had on the ability of the other food inspectors to perform scheduled inspections; the short notice of the requests; and the possible adverse effects on the shellfish shippers and dealers if their inspections could not be timely performed.

6. The Performance Evaluations

DEC employees including Food Inspectors are evaluated on an annual basis, and on a semi-annual basis by the employee's immediate supervisor, referred to as "six month recertifications." An employee's date of hire generally serves as the first day of that employee's annual evaluation, with certain exceptions based upon civil service-related matters.

The fact that there was a four-month gap between the termination of the Plaintiff's OGS employment and the commencement of his DEC employment presented an issue for DEC personnel in Albany as to their determination of the Plaintiff's proper date for evaluation purposes. Further, Ritchie was four weeks late in performing the Plaintiff's six-month recertification, in which the Plaintiff received a mark of "Unsatisfactory." However, under DEC policy, this untimeliness entitled him to receive a mark of "Satisfactory,"

The Plaintiff asserts that, in order to avoid this "technicality," Ritchie and Hastback conspired to create an *ad hoc* probationary period so that his starting date was recast as October 12, 2011. However, Sherri Montross, an Associate Personnel Administer, initially informed the Defendants that there was no probationary period for the Plaintiff.

On January 24, 2012, Montross sent an email to Hastback stating that the Plaintiff's performance evaluation date was October 12, 2011. (Combined Rule 56.1 Statement, at ¶ 231.)

On April 11, 2012, the Plaintiff again received an evaluation of "Unsatisfactory" from Ritchie. This time, Ritchie explained that the Plaintiff had used his time inefficiently; had not always produced clear and concise inspection reports; failed to conduct timely re-inspections; was frequently late for work or absent; had taken a substantial amount of leave time; and had not complied with DEC procedures concerning the use of a personal vehicle and proper recording of time and attendance.

The Plaintiff maintains that these unsupported evaluations precluded him from receiving a monetary bonus and diminished his prospects for advancement. The Plaintiff also maintains that, in violation of DEC policy, Ritchie did not meet with him to discuss his performance.

7.  <u>The Search of the Plaintiff's Work Area</u>

On June 4, 2012, while standing outside DEC's East Setauket office, the Plaintiff observed Ritchie, Athawes, and Usbeck searching through his desk.  After the Plaintiff entered the building, he opened his desk drawers and saw that his "personal belonging were all ravaged through" but "nothing was missing from me personally." (Pl's Dep., at 43.)  According to the Plaintiff, Ritchie told him that she, Athawes, and Usbeck were looking for notepads in his desk. The Plaintiff did not recall having any further conversation with Ritchie about the search, and had not spoken about it with Athawes or with Usbeck.

The Plaintiff alleges that an incomplete inspection report pertaining to a shipper, Aqua Best, had been in his desk.  The report was then allegedly taken, copied without his knowledge, and replaced, and that it was used as material to later interrogate him.

Gilmore and Hastback had no advance knowledge or participation in this search.

8.  <u>Miscellaneous Alleged Discriminatory Conduct</u>

The Plaintiff also contends that throughout his employment with DEC, he was the only Food Inspector I in his unit that was denied reimbursement for using his personal vehicle for work-related duties after being assured by certain of the Defendants that he would be so eligible. The Plaintiff further contends that only he was denied the use of his *per diem* allowance for meals and lodging.  The Plaintiff also asserts that he did not receive adequate training and was excluded from critical meetings.

The Plaintiff further asserts that, despite living farther from DEC's office building than the other Food Inspectors did, he was forced to arrive at work earlier.  The Plaintiff contends that the Defendants failed to give him early morning access to the DEC office and, at times, he was forced to relieve himself in the building's shrubbery.

The Plaintiff also points out that he complained about disparate treatment, both in written and oral form, although in general terms, yet the Defendants and others failed to report the Plaintiff's allegations to the OAA, although they had an affirmative obligation to do so under DEC policy.

9. The "Interrogation"

At some point, Gilmore requested in writing to his superiors that disciplinary proceedings against the Plaintiff be commenced. (Flynn Dep., at 35.) On April 6, 2012, Ritchie emailed Patricia Riexinger ("Riexinger"), the Director of the Division of Fish and Wildlife and Gilmore's direct supervisor, concerning the Plaintiff, describing the problems she perceived with the Plaintiff's inspections. Ritchie also described how she, Athawes, and Usbeck were fearful of the Plaintiff and how the work environment had become "stressful for everyone in the unit." (Pl's Exh. 137) However, Athawes and Usbeck testified that they were not afraid of the Plaintiff, and Usbeck described him as "pleasant." (Athawes Dep., at 65; Usbeck Dep. at 99, 102).

That same day, Riexinger forwarded that email to Theresa Flynn ("Flynn"), the DEC Labor Representative II; Mark Cadrette ("Cadrette"), DEC's Director of Office of Employee Relations and Flynn's direct supervisor; Gilmore; Hastback; and Ann Lapinski, a DEC Associate Attorney and Acting Director of Internal Audit and Investigation, asking for a meeting to "address[] this chronic and inexcusable bad work performance by [the Plaintiff."] (Combined Rule 56.1 Statement, at ¶ 129.)

On June 26, 2012, the Plaintiff was the subject of an "Interrogation" conducted by Flynn. The relevant collective bargaining agreement ("CBA") defined an "Interrogation" as "the questioning of an employee who, at the time of the questions, has been determined to be a likely

subject for disciplinary action." (CBA, at § 33.3[b]).  None of the Defendants were present at this "Interrogation" nor did any hold supervisory authority over Flynn.

The Plaintiff alleges that he was questioned about his inspection of Aqua Best, based upon information obtained as a result of the search of his work area led by Ritchie.  The Plaintiff was not subject to any other formal interrogations, though he alleges that he was subject to informal "interrogations" where, on one occasion, he was forced to divulge private medical information to Ritchie or be subjected to discipline. (Pl's Dep., at 72.)

On June 28, 2012, Patricia Riexinger ("Riexinger") emailed Alison Crocker, DEC Deputy Counsel, and Cadrette, stating:

> [B]ased upon preliminary feedback from Theresa [Flynn, who conducted the interrogation] after the interrogation that there didn't seem to be much we could do.  Continued documentation is not enough; we simply have to get rid of this guy.  I don't care if you put him on medical leave but he has to go.  We are seriously affecting the work of the Unit (food inspection: think "people get sick and die…") and the health of our previously productive and enthused staff.
>
> I cannot leave this to Theresa only.  I need your help and intervention to FIX THIS PROBLEM.  Please help us.

(Combined Rule 56.1 Statement, at ¶ 159.)

10. The Notice of Reassignment

An email written on July 17, 2012 by Philip Lodico, DEC in-house counsel, that was either sent to and/or forwarded to Cadrette, Flynn, and others stated:

> If you decide to reassign him, he should be given duties within the range/scope of his title … manual labor normally is associated with a low pay grade.  I seem to recall being told that he verbalized an intent to complain about treatment by his supervisors.  If true and manual labor is not within [sic] the range/scope of his title, assigning him such duties could be reviewed as retaliation.

(Id. at ¶ 161.)

Nonetheless, the Plaintiff received a notice of intent dated July 27, 2012 to temporarily reassign him and that afforded him two options: accept the reassignment with pay or be suspended without pay. (Pl's Exh. 75.) The temporary reassignment was based on the Plaintiff's "inability to perform timely sanitary inspections and related reports." (Id.) The notice of intent also stated:

> The Department has lost its trust in your ability to conduct inspections when assigned. This causes the remaining food inspectors in the Shellfish Program to perform the additional duties that you were hired to perform, as well as re-inspect and verify inspections you had completed. Because of this, the Department believes your continued presence on the job is causing a severe disruption to operations. In addition, the Department believes that allowing you to continue to perform in this manner, represents a potential danger to public health.

(Id.)

On July 30, 2012, the Plaintiff sent a letter to Cadrette accepting the "demotion" with pay and stating:

> I strongly disagree with the reasons . . . for the decision to either have me suspended without pay or reassigned to a position that, in effect, amounts to a demotion. I believe that these reasons are a pretext designed to mask the unlawful conduct of my supervisors, including Messrs. Gilmore and Hastback and Ms. Ritchie.

(Combined Rule 56.1 Statement, at ¶4A)

The Plaintiff was reassigned to work under Lisa Tettlebach, a Marine Biologist I, who was the same grade level (18) as him. In his new role, the Plaintiff was required to perform manual labor such as making copies, tasks he considered beneath his professional status. The Plaintiff further asserts that he was directed to perform work on a boat, despite verbalizing his fear of being on the water and Gilmore being made aware of this phobia.

11. <u>The Notice of Discipline</u>

On August 3, 2012, the Plaintiff received a notice of discipline, which charged the Plaintiff with, among other things, (1) insubordination in that he failed to comply with his supervisor's directive to perform scheduled inspections at the Fulton Fish Market; (2) failed to provide, as directed, medical documentation for unscheduled absences; and (3) improperly used a New York State Citibank travel card issued to him. (Pl's Exh. 73.) None of the charges in the notice of discipline pertained to Aqua Best or ISCC standardization.

On August 6, 2012, the Plaintiff filed an internal grievance with DEC seeking "withdrawal of the notice of discipline and removal of the notice of discipline and all relevant papers from my personal history folder." (Pl's Exh. 72.)

In October 2012, after the Plaintiff's resignation from DEC, it agreed not to pursue the disciplinary process if the Plaintiff completed his 52-week probationary period with A&M. The Plaintiff agreed to this proposal.

Although the Plaintiff was not formally disciplined thereafter, the Plaintiff alleges that his future employment opportunities were diminished by virtue of the notice of discipline and the fact that it remained in his employment file with DEC. Moreover, the Plaintiff points to Cadrette's March 14, 2014 testimony that the notice of discipline was being held in abeyance beyond the promised 52-week period. (Cadrette Dep., at 136-138.)

12. <u>The "Retaliation" against the Plaintiff for the OGS Lawsuit</u>

As noted above, before working for DEC, the Plaintiff was employed by OGS from 2004 through 2011. While still employed by OGS, in April 2010, the Plaintiff brought an action in Supreme Court, Dutchess County (the "OGS Action"), alleging that he was discriminated against by OGS on the basis of race and national origin, and was retaliated against for having

complained about the alleged discrimination. In March 2013, the OGS action was dismissed on a summary judgment motion. An appeal of that dismissal is pending.

The Plaintiff contends that a statement made by Ritchie to "Sue me," uttered in the context of discussion of the changed evaluation period, signified that Ritchie had prior knowledge of the OGS lawsuit. Indeed, on June 19, 2012, the Plaintiff sent an email to Ritchie that concluded with the following statement: "I understand that because you are aware of my complaint against the State, you with the support of others have chosen to treat me differently over these last few months." (Combined Rule 56.1 Statement, at ¶4A)

However, this email did not identify the names of the defendants in the OGS action; whether the OGS action was employment-related; the subject matter of the OGS action; or whether the OGS action pertained to discrimination on the basis of race or national origin.

The Plaintiff interpreted Ritchie's failure to reply to the email as meaning that "[s]he basically acknowledged that it was true, that she knew." (The Pl's Dep., at 27-28.) Although Ritchie did not reply to that email, she forwarded it to Flynn, with copies to Gilmore and Hastback, in which she stated: "First of all, I have no knowledge of him lodging a complaint against the State." (Combined Rule 56.1, at ¶ 61.) The Plaintiff characterizes this assertion as self-serving and maintains that the Defendants were aware of the OGS lawsuit at this time. The Defendants contend that neither Gilmore nor Hastback knew about the Plaintiff's OGS Action until they received the complaint in this action.

13. <u>Hostile Work Environment</u>

The summary judgment record indicates that none of the Defendants made derogatory statements, whether based on race, color, or national origin, directly to him, or about him to others, or that any defendant physically threatened him. However, in addition to the above-

mentioned instances of alleged discriminatory conduct, the Plaintiff contends that (1) Ritchie once told him his "opinion did not count;" (2) Ritchie once told him that she had many important things to attend to and that the Plaintiff was not one of them; and (3) Hastback once told the Plaintiff to leave his office in an abrasive manner.

14. The Present Action

As noted above, on August 1, 2012, while still employed at DEC, the Plaintiff commenced the present action.

15. The Resignation

By letter dated September 12, 2012 addressed to DEC's Human Resources Department in Albany, NY, the Plaintiff resigned from the DEC, citing "continuous and ongoing discrimination because of my race and national origin and retaliation against me." This letter was neither forwarded to the OAA nor acted upon in any way. (Hastback Dep., at 292.) The Plaintiff began working for A&M the next day.

The Defendants contend that the Plaintiff did not suffer any "adverse employment action" thereafter. However, according to the Plaintiff, the notice of discipline was not withdrawn from his personnel file and, therefore, he continually suffered an "adverse employment action" in this respect. The Plaintiff was referred to the Inspector General's ("IG") Office, which examines allegations of misconduct by DEC employees, although it appears no discipline was rendered in connection with that referral.

**II. DISCUSSION**

A. The Legal Standard on Summary Judgment

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. <u>Nunn v. Mass. Cas. Ins. Co.</u>, 758 F.3d 109, 114 n. 4 (2d Cir. 2014).  Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue for trial, and cannot rely merely on allegations or denials contained in the pleadings. <u>See</u> Fed. R. Civ. P.  56(c); <u>accord</u> <u>Fabrikant v. French</u>, 691 F.3d 193, 205 (2d Cir. 2012).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." <u>Ridinger v. Dow Jones & Co. Inc.</u>, 651 F.3d 309, 317 (2d Cir. 2011)(citation omitted).

In cases involving claims of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 603 (2d Cir. 2006)(citation omitted).  Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 137 (2d Cir. 2008).  Ultimately, the test for summary judgment is whether "a reasonable jury could return a verdict for the nonmoving party." <u>Nunn</u>, 758 F.3d at 114 n. 4 (citation omitted).

B. <u>Preliminary Matters</u>

    1.  <u>The Plaintiffs' Rule 56.1 Statement and Memorandum in Opposition</u>

Before examining the merits of the Plaintiff's claims, a brief word in is order about the form in which the Plaintiff's allegations were submitted to this Court.

Initially, the Court notes that the Plaintiff is primarily responsible for the sheer length of the 169 page Combined Rule 56.1 Statement, even though Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York requires a party opposing a motion for summary judgment to submit "a numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, <u>short and concise statement</u> of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b)(emphasis added).

In this case, as to the Plaintiff's Counter-statement of Material Facts, "apart from the fact that it ignores the Rule's requirement that a statement be 'short and concise,' is problematic for the simple reason that it is not limited to facts as to which it is contended that no genuine triable issue exists, but is instead rife with opinions, legal arguments, and blatant conjectures that clearly are disputed in this litigation." <u>Sheppard v. Beerman</u>, 190 F. Supp. 2d 361, 363 (E.D.N.Y. 2002) <u>aff'd</u>, 317 F.3d 351 (2d Cir. 2003). Of particular relevance here, the Plaintiff points to a number of documents and oral complaints he made to his superiors, seeking redress for "disparate treatment" and "unlawful" conduct by his superiors. However, this document strains credulity by denying that the Plaintiff never alleged race, color, or national origin discrimination to any of his superiors prior to his resignation letter.

In addition, in his memorandum in opposition, the Plaintiff takes liberties with the record, often citing to evidence that, when examined, fails to support his assertion. For example, in his memorandum of law, the Plaintiff states that he was "reassigned days before the NOD was fully adjudicated." (Docket No. 51, at 25.) However, the record is plain that the NOD was never fully adjudicated. Relatedly, the Plaintiff cites Flynn's testimony for the proposition that it is against

DEC policy that a reassignment occurs before adjudication of a notice of discipline. However, a close reading of Flynn's testimony reveals that he does not refer to DEC policy or the CBA. (Flynn Dep., at 208-209.) Further, citing to the Rule 56.1 Statement, the Plaintiff alleges that Ritchie contacted the defendants in the OGS Action before hiring him. However, that assertion is inaccurate because there is no indication that Ritchie communicated with any of the three individual defendants in the OGS Action.

Despite these infirmities, the Court, of course, will seriously consider the Plaintiff's arguments.

2. <u>The Claims Against the Defendants in their Official Capacities</u>

The Defendants are each sued in their personal and official capacities. (Compl., at 8, 10, 12.) However, "[t]he Eleventh Amendment bars suits in federal court by citizens against a state and its agencies, absent a waiver of immunity or Congressional legislation specifically overriding immunity." <u>Martinez v. Healey</u>, No. 14-CV-302 (NSR), 2014 WL 5090056, at *6 (S.D.N.Y. Oct. 10, 2014)(citing <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 99–100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984). It is well-established that New York State has not consented to Section 1983 suits in federal court, <u>Trotman v. Palisades Interstate Park Comm'n</u>, 557 F.2d 35, 38–40 (2d Cir. 1977), and that Section 1983 was not intended to override a state's sovereign immunity, <u>Quern v. Jordan</u>, 440 U.S. 332, 340–42, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979). Thus, because a Section 1983 claim against a New York state official in his or her official capacity is deemed to be a suit against the state of New York, <u>Kentucky v. Graham</u>, 473 U.S. 159, 165–66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985), the Eleventh Amendment precludes any such claim.

Under Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), a "plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that [her] complaint[:] (a) alleges an ongoing violation of federal law[;] and (b) seeks relief properly characterized as prospective." Clark v. DiNapoli, 510 F. App'x 49, 51 (2d Cir. 2013)(internal quotation marks and citation omitted).

In this case, as the Plaintiff has not been employed by DEC for more than two years, he fails to plausibly allege an ongoing violation of federal law on the part of the Defendants in their official capacities.

Alternatively, "[n]either a state nor its employees sued in their official capacities are considered 'persons' that can be sued under section 1983 because of the state's Eleventh Amendment immunity." Corrado v. New York State Unified Court Sys., No. CV 2012-1748 (DLI)(MDG), 2014 WL 4626234, at *9 (E.D.N.Y. Sept. 15, 2014)(citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) and Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999)).

3. The Claims Based on National Origin

The Plaintiff points to nothing in the record as to the Defendants' respective national origins or, for that matter, any individual at DEC besides himself. The Plaintiff apparently assumes that the national origin of these other individuals was all "American." However, even making all factual inferences in the Plaintiff's favor, the Court is unprepared to make that particular assumption. In any case, there is no evidence in the record to suggest that the Plaintiff was discriminated against on the basis of national origin and the Court, therefore, dismisses all claims based on that protected characteristic.

Further, even if there were a genuine issue of material fact related to a claim of national origin discrimination, such a claim would be cognizable only under the NYSHRL, as opposed to Section 1981, which, as set forth later, is limited to protections against unlawful discrimination on the basis of race or color. Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 42 (2d Cir. 1984)("[Section] 1981 provides protection against discrimination in private employment on the basis of race or color.")

4. Exhaustion of Administrative Remedies

In responding to the Defendants' Rule 56.1 Statement, the Plaintiff conceded that he did not file a complaint with the New York State Division of Human Rights, which is "a jurisdictional bar to the later assertion of a judicial claim regarding the same alleged discrimination." Estronza v. RJF Sec. & Investigations, No. 12-CV-1444 (NGG)(JO), 2014 WL 5871203, at *7 n. 7 (E.D.N.Y. Aug. 27, 2014), report and recommendation adopted as modified sub nom. Estronza v. RJF Sec. & Investigations, No. 12-CV-1444 (NGG)(JO), 2014 WL 5877942 (E.D.N.Y. Nov. 12, 2014).  However, "a failure to exhaust administrative remedies is an affirmative defense that a defendant must plead and can waive." Id.

Here, the Defendants did not plead failure to exhaust administrative remedies as an affirmative defense in their answer, (Docket No. 10), nor do they make this argument in support of their motion for summary judgment.  Accordingly, the Court deems any exhaustion defense under the NYSHRL to be waived.

C. The Discrimination Claims

The Plaintiff asserts claims against the Defendants for race, color, and national origin based on discrimination in violation of 42 U.S.C. § 1983, § 1981, and the NYSHRL.

1. <u>The Applicable Legal Standards</u>

Section 1983 provides plaintiffs with the power to bring a suit if they have been subjected, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). The NYSHRL prohibits an employer from discriminating against an individual on the basis of her "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status." N.Y. Exec. L. § 296(1)(a).

Further, "individual liability may arise under the NYSHRL as well as §§ 1981 and 1983 if a plaintiff shows that the individual defendants were personally involved or participated in the violation." <u>Croons v. New York State Office of Mental Health</u>, No. 6:10-CV-1277 (DNH), 2014 WL 1877569, n. 11 (N.D.N.Y. May 12, 2014).

Claims of disparate treatment under § 1983, § 1981, and the NYSHRL are assessed using the burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). <u>Pilgrim v. McGraw–Hill Cos.</u>, Inc., 599 F. Supp. 2d 462, 468 (S.D.N.Y. 2009)("[T]he standard for all [] section 1981, [and NYSHRL] employment discrimination claims is the same.").

This framework places the initial burden of establishing a *prima facie* case of discrimination on the plaintiff, who must demonstrate that: (1) he is a member of a protected

class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010). While this burden has been characterized as "minimal," the plaintiff must still "proffer some admissible evidence of circumstances that would permit an inference of discriminatory motive." Risco v. McHugh, 868 F. Supp. 2d 75, 98–99 (S.D.N.Y. 2012).

This burden then shifts to the defendant to offer "legitimate and non-discriminatory reasons for the adverse employment action demonstrated in plaintiff's prima facie case." Id. at 99 (citing Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001)). The burden at this stage is also "light," and "[t]he employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." Id. (citations and emphasis omitted). Importantly, "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Id. (citations omitted).

The burden then remains with the plaintiff to produce sufficient evidence to cast doubt on the defendant's legitimate, non-retaliatory reasons. Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 249 (N.D.N.Y. 2010). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Risco, 868 F. Supp. 2d at 99 (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

Notably, "in order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence; it must be

enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." Barounis v. N.Y.C. Police Dep't, No. 10 Civ. 2631(SAS), 2012 WL 6194190, at *6 (S.D.N.Y. Dec. 12, 2012)(citations omitted). In other words, a plaintiff must do "more than cite to [his] mistreatment and ask the court to conclude that it must have been related to [his] race." Id. (quoting Lizardo v. Denny's Inc., 270 F.3d 94, 104 (2d Cir. 2001)).

Here, it is undisputed that the Plaintiff is a member of a protected class in terms of race and color and established basic eligibility for the position of Food Inspector 1. The Plaintiff contends that he was subjected to "multiple adverse employment actions." The Defendant takes umbrage with all of these, characterizing the majority as minor issues that do not rise to the level of an "adverse employment action."

For the sake of clarity, the Court structures its discussion of the Plaintiff's claim of discrimination and the required elements by the alleged individual acts of discrimination under Sections 1983, 1981, and the NYSHRL. The Court will then address the Plaintiff's cumulative or aggregate theory of "adverse employment actions."

2. Adverse Employment Actions Considered Individually

Employment actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an "adverse employment action" include "'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)(quoting Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004)(internal quotation marks omitted)). "[T]here is no exhaustive list of what constitutes an adverse employment action. Courts have

held that termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions." Little v. NBC, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002).

The Court first considers the failure of DEC to notify the Plaintiff of his hiring for more than two weeks after his interview. Although "adverse employment actions extend beyond readily quantifiable losses, 'not everything that makes an employee unhappy is an actionable adverse action.'" Sank v. City Univ. of New York, No. 94 Civ. 0253 (RWS), 2003 WL 1807142, at *10 n. 24 (S.D.N.Y. Apr. 7, 2003)(citation omitted). Thus, the alleged belated failure to so notify the Plaintiff is plainly not actionable.

Relatedly, the Court also finds that the failure to receive a "welcome" letter or the Plaintiff's exclusion from certain meetings plainly does not rise to an "adverse employment action" as neither affected the terms and conditions of the Plaintiff's employment.

The Court pauses to note that, in his papers, the Plaintiff repeatedly conflates the required element of "adverse employment action" for a discrimination claim with the required showing of disparate treatment – that is to say, not every action taken by an employer, even if taken in a discriminatory manner compared to other employees, is actionable discrimination under Section 1983, 1981, and the NYSHRL. In other words, no matter how much the Plaintiff was treated differently than other employees in terms of "welcome letters" and other seemingly trivial matters, such conduct is not actionable under those statutes absent a concomitant "adverse employment action."

Circling back to the alleged adverse employment actions, the Court finds that the Plaintiff's contention that Ritchie prevented him from becoming ISSC-compliant is belied by the summary judgment record, and, even if true, is not an "adverse employment action." Indeed, the record indicates that the Plaintiff's standardization expiration date was August 1, 2016 and the Plaintiff concedes that "he may have been standardized in name." (Combined Rule 56.1 Statement, at ¶ 104.) Regardless, even if Ritchie prevented the Plaintiff from becoming ISSC-compliant, the fact that (1) the New York State Department of Civil Service's description of the Food Inspector 1 position made no reference to the ISSC or to ISSC standardization requirements; (2) the Plaintiff's performance standards do not refer to ISSC standardization and (3) neither the notice of intent to temporarily reassign nor the notice of discipline made reference to ISSC standardization, defeats any contention that Ritchie's alleged obstructionism of the Plaintiff's becoming ISSC-compliant constituted an "adverse employment action."

Similarly, the Plaintiff's contention that he was not adequately trained does not, on this record, constitute an "adverse employment action." Indeed, the denial of professional training opportunities may constitute an "adverse employment action" "only where an employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities.'" Trachtenberg v. Dep't of Educ. of City of New York, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013)(citation omitted); see Novak v. Waterfront Com'n of N.Y. Harbor, 928 F. Supp. 2d 723, 731 (S.D.N.Y. 2013).

Here, there is no evidence that any denial of professional training materially harmed the Plaintiff. Of relevance here, the Plaintiff was hired by A&M before his resignation from DEC and the Plaintiff does not bring a "failure to promote" claim.

The Court also finds that the reinspection by the other Food Inspector 1s of suppliers previously inspected by the Plaintiff does not constitute an "adverse employment action."  With respect to heightened scrutiny by an employer, it is well-settled that "[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences." Scafidi v. Baldwin Union Free School Dist., 295 F.Supp.2d 235, 239 (E.D.N.Y. 2003); see also Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001)("It hardly needs saying that a criticism of an employee . . . is not an adverse employment action."), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); Hubbard v. Port. Auth. of New York and New Jersey, No. 05 Civ. 4396 (PAC), 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008)(stating that "courts in this circuit have found that reprimands and . . . excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation")(internal quotation marks and citations omitted); Castro v. New York City Bd. of Educ. Personnel, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998)(stating that "although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions").   Here, there is no evidence that any heightened scrutiny on the Plaintiff was accompanied by other tangible, unfavorable consequences.

The Court also finds that the "unsatisfactory" mark given to the Plaintiff in April 2012 did not constitute an adverse employment action for purposes of the anti-discrimination statutes. Leon v. Dep't of Educ., —— F. Supp. 2d ——, ——, 10–CV–2725 (WFK), 2014 WL 1689047, at *13 (E.D.N.Y. Apr. 29, 2014)("Plaintiff argues that deprival of her top-choice teaching assignment, *negative performance evaluations*, exclusion from certain extracurricular school

activities, and questioning as to when she would retire constitute adverse employment actions. But, none of those acts rises to the level of a materially adverse change in the terms and conditions of her employment sufficient to state a claim under the ADA . . . [and] NYSHRL")(emphasis added); see also Benedith v. Malverne Union Free Sch. Dist., No. 11-CV-5964 (ADS)(GRB), 2014 WL 4056554, at *32 (E.D.N.Y. Aug. 15, 2014).  "A plaintiff's 'subjective disagreement with [his or her] reviews is not a viable basis for a discrimination claim.'" Khan v. Abercrombie & Fitch, Inc., No. 01 CIV. 6163 (WHP), 2003 WL 22149527, at *7 (S.D.N.Y. Sept. 17, 2003)(citing Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir. 2000)).  Nor does the Court find that Ritchie's failure to meet with the Plaintiff for his evaluations rises to the level of an "adverse employment action."

The Court next considers the search of the Plaintiff's desk by Ritchie, Athawes, and Usbeck.  According to the Plaintiff, an incomplete inspection report pertaining to Aqua Best had been in his desk, taken, and copied and used as additional material to interrogate him during the June 26, 2012 interrogation.  However, none of the charges in the notice of discipline pertained to Aqua Best, and, in any event, the notice of discipline itself, as explained later, did not constitute an "adverse employment action."  Under these circumstances, the search of the Plaintiff's desk, while intrusive and perhaps unprofessional, did not constitute an "adverse employment action," as such conduct did not materially change the terms and conditions of his employment. Davis v. NYS Dep't of Corr. Attica Corr. Facility P.O. Box 149 Attica, N.Y. 14011, No. 10-CV-6641 (EAW), 2014 WL 4542970, at *7 (W.D.N.Y. Sept. 12, 2014)(" There is nothing in the record to support the conclusion that the alleged search [of the Plaintiff's office] materially altered the terms and conditions of Plaintiff's employment."); Roff v. Low Surgical &

Med. Supply, Inc., No. CV033655(SJF)(JMA), 2004 WL 5544995, at *7 (E.D.N.Y. May 11, 2004)("plaintiff's allegation that her vehicle and personal belongings were searched also does not constitute an adverse employment action, as such conduct did not materially change the terms and conditions of her employment."); see also Sharpe v. Utica Mut. Ins. Co., 756 F. Supp. 2d 230, 243 (N.D.N.Y. 2010).

Finally, the Court pauses to note that even if the search of the Plaintiff's desk constituted an "adverse employment action," a claim under § 1981 or the NYSHRL based on this action could not be asserted against Gilmore or Hastback, who had no advance knowledge of, or participation in, the search.

The Court next finds that the notice of discipline issued against the Plaintiff, without more, does not qualify as an "adverse employment action." Weeks, 273 F.3d at 86 (holding that a notice of discipline and counseling memo were insufficient to constitute an adverse employment action). This is because DEC did not pursue the notice of discipline nor was it was ever adjudicated under the CBA. The Plaintiff speculates about how the notice of discipline, and DEC's alleged failure to remove it from his personnel file, affected his career opportunities. However, he has not presented any evidence that it actually did so, such as showing that he applied for and was denied a promotion to the next level in DEC. See generally Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 218-19 (E.D.N.Y. 2014).

In addition, the Plaintiff has no basis for claiming that A&M, or any other employer, knew of the pending disciplinary proceeding, let alone that it factored into a decision to hire or not hire the Plaintiff after his resignation from DEC. Compare Mento v. Potter, No. 08-CV-74S (WMS), 2012 WL 1908920, at *8 (W.D.N.Y. May 25, 2012)("Gavner went out of his way to warn others, alerting Maryann Molenda when she spoke to Gavner about assigning a work detail

29

to Plaintiff, that Mento had disciplinary matters in her file. Molenda then interviewed Mento for the position of complaint and inquiry clerk, and rejected Plaintiff in October of 2005. It is thus certainly possible that disciplinary charges impacted her chances of getting that position.")(internal citations omitted).

The Court next considers the fact that the Plaintiff was denied reimbursement for his use of a personal vehicle for work-related duties. To the extent the Plaintiff seeks redress for not being reimbursed for his commute from home to work, this denial could not constitute an "adverse employment action" as it was consistent with DEC policy. (Combined Rule 56.1 Statement, at ¶ 180.) To the extent the Plaintiff seeks redress for unfairly being denied access to a DEC vehicle, this denial also could not constitute an "adverse employment action" because there is no evidence that access to a DEC vehicle was a guaranteed employment benefit, or even that it was a term or condition of the Plaintiff's employment.

Again, although "adverse employment actions" may include lesser actions than those stated above — i.e., termination, demotion, etc. — such lesser actions must have the effect of changing "the total circumstances of [the employee's] working environment . . . to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002)), aff'd 112 F. App'x 761 (2d Cir. 2004). Here, the Plaintiff's inability to use a DEC vehicle did not have the effect of causing his working environment to become "inferior" or "adverse" as compared to the "normal" workplace. See Knox v. Town of Se., No. 11 CIV. 8763 (ER), 2014 WL 1285654, at *10 (S.D.N.Y. Mar. 31, 2014)("being denied the ability to keep the Town vehicle overnight cannot be characterized as an 'adverse employment action' under even the most liberal reading of the phrase.")

Similarly, to the extent the Plaintiff seeks redress for not being able to drive his personal vehicle directly to an inspection site, even if contrary to prior assurances by Hastback and even if he did not charge for mileage, there is no evidence that this denial affected the terms or conditions of his employment with DEC. Nor does the Defendants' denial to the Plaintiff to early morning access to the East Setauket DEC office qualify as an "adverse employment action" because the summary judgment record indicates that, with a SG-18 pay level, the Plaintiff was not entitled to swipe cards for such access.

Again, the Court makes clear that whether the Plaintiff was treated differently than Athawes and Usbeck with regard to personal vehicle reimbursement or access to a DEC vehicle is irrelevant to the separate question whether that treatment constituted an "adverse employment action" under McDonnell-Douglass.

With regard to the "Interrogation" of the Plaintiff, the Court notes that the Second Circuit has instructed that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006). Thus, even if the "Interrogation" constituted disciplinary action under the CBA, it does not follow that this disciplinary action constituted an "adverse employment action" for purposes of Section 1983, Section 1981, and the NYSHRL. Lyman v. NYS OASAS, 928 F. Supp. 2d 509, 521 (N.D.N.Y. 2013)("interrogations alone are insufficient as a matter of law to establish an adverse employment action.")

That said, the fact that the "Interrogation" was conducted in an exposed public room and possibly contrary to DEC policy, as the Plaintiff did not receive a formal notice of violating any

workplace rules prior to the "Interrogation," suggests that it may have been conducted in an unreasonable manner and thus may have been an "adverse employment action."

However, "it is not enough for the Plaintiff to allege a violation of the Constitution or federal law under Section 1983. The Second Circuit has long recognized that a plaintiff asserting claims under § 1983 must allege the personal involvement of each individual defendant acting under color of state law." 545 Halsey Lane Properties, LLC v. Town of Southampton, No. 14-CV-800 (ADS)(GRB), 2014 WL 4100952, at *18 (E.D.N.Y. Aug. 19, 2014)(Spatt, J.); Back v. Hastings On Hudson Union Free School Dist., 365 F.3d 107, 122 (2d Cir. 2004)("Additionally, '[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'")(quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)).

Applying that requirement here, the Court notes that it is undisputed that none of the Defendants took part in or were present at the "Interrogation." Even if the Defendants were the source of any of the information that the Plaintiff was asked about, the allegedly unlawful issues with the "Interrogation" were not its substance, but its procedure, namely that it was done in public view and prematurely. In other words, while the Defendants may have played a role in the events leading up to the "Interrogation" and influenced what was said during the Interrogation, there is no evidence that the Defendants had anything to do with these potentially unlawful infirmities and, thus, no role in the "Interrogation" being "adverse." Under these circumstances, the Court declines to find that the "Interrogation," which was expressly provided for in the CBA, constituted an "adverse employment action" in which any of the Defendants played a personal role. In any event, the Court would find that the "Interrogation" did not occur under circumstances giving rise to an inference of discrimination on the basis of race or color.

32

The Court reaches a somewhat different conclusion with respect to the change in the Plaintiff's evaluation period, even if proper. Flynn testified that a failure to conduct a recertification in a timely manner required an evaluation of "satisfactory . . . which would entitled the employee to receive [additional] pay." (Flynn Dep., at 71.) To be sure, the Court distinguishes between the negative performance evaluations, which by themselves are not "adverse employment actions," and the alleged departure from protocol in its procedures, which may constitute an "adverse employment action."

In any event, the Court finds that there is no genuine issue of material fact as to whether any of the Defendants played a personal role in the change in evaluation period. To the contrary, the summary judgment record indicates that this change was made at the direction of Montross based on written guidance from the Governor's Office of Employee Relations, notwithstanding that Hastback had been "grinding" or going back and forth on this issue. (Combined Ruled 56.1 Statement, at ¶ 231.) Accordingly, the Court declines to find that the change in the Plaintiff's evaluation period constituted an "adverse employment action" in which any of the Defendants played a personal role. In any event, the Court finds that the change in the Plaintiff's evaluation period did not occur under circumstances giving rise to an inference of discrimination on the basis of race or color.

With regard to the Plaintiff's reassignment, the Court finds that a genuine issue of material fact exists as to whether this action constituted an "adverse employment action." When a plaintiff alleges that a job transfer constitutes an adverse employment action, the plaintiff must show that the new work assignment was "materially less prestigious, materially less suited to his [or her] skills and expertise, or materially less conducive to career advancement." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000). However,

"[c]hanges in assignments or duties that do not 'radical[ly] change' the nature of work are not typically adverse employment actions." Weisbecker v. Sayville Union Free Sch. Dist., 890 F. Supp. 2d 215, 233 (E.D.N.Y. 2012)(citing Galabya, 202 F.3d at 641). A "'bruised ego,' " a "'demotion without change in pay, benefits, duties, or prestige,'" or "'reassignment to [a] more inconvenient job'" are insufficient to constitute a tangible or material adverse employment action. Johnson v. Cnty. of Nassau, 480 F. Supp. 2d 581, 595 (E.D.N.Y. 2007)(citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 772, 118 S. Ct. 2257, 2274, 141 L. Ed. 2d 633 (1998)).

In this regard, a "'pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.'" Gordon v. New York City Bd. of Educ., No. 01 Civ. 9265 (SAS), 2003 WL 169800, at *6 (S.D.N.Y. Jan. 23, 2003)(quoting Pimentel v. City of New York, No. 00 Civ. 326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002)); see Galabya, 202 F.3d 636, 641 (2d Cir. 2000) (holding that the plaintiff's transfer from one special education school to another was not an adverse employment action where there was no evidence that the new assignment was "less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement").

Here, there is evidence, in the form of the Plaintiff's testimony, Cadrette's testimony (Cadrette Dep., at 92-93.), and Lodico's email that the shift to manual labor of the type the Plaintiff was allegedly directed to perform upon his reassignment constituted an "adverse employment action" as perceived within DEC. Cadrettte also testified that it is contrary to DEC policy for an employee to be supervised by another employee of the same grade level. (Id.)

To be sure, the Court does not hold that the fact that the reassignment occurred prior to the issuance of the notice of discipline constituted an "adverse employment action" because such

an action, although not the usual course of events, (1) was expressly permitted under CBA ¶ 33.4(a)("[p]rior to the service of a notice of discipline or the completion of the disciplinary procedure set forth in Section 33.5, an employee may be suspended without pay or temporarily reassigned by the appointing authority, or the authority's designee, in his/her discretion, only pursuant to paragraphs (1) and (2) of this subdivision" and (2) was not so unusual as to be completely out of the norm. (Flynn Dep., at 208-209.)

Turning to the question of whether the reassignment occurred under circumstances giving rise to an inference of discrimination, the Court notes that "[a]n inference of discriminatory intent may be drawn if an employee shows direct evidence of such intent or that he was subjected to disparate treatment compared to persons who were not members of his protected class but similarly situated in all other material respects to himself. " Gibbs v. Metro. Transp. Auth., No. 13-CV-1583 (ILG)(RER), 2014 WL 5842833, at *5 (E.D.N.Y. Nov. 12, 2014). "Because direct evidence of discriminatory intent will 'only rarely be available, . . . 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Id.

In this case, the Plaintiff has shown no direct evidence of discriminatory intent. Indeed, he concedes that he never heard any of the Defendants utter ephitets related to race or color to anybody. Nor, in the Court's view, is there sufficient circumstantial evidence to give rise to an inference of discrimination. Although the two other Food Inspector 1s, Athawes or Usbeck, both of whom are white, shared the same title, duties, and supervisors as the Plaintiff, this is insufficient to make them "similarly situated" to the Plaintiff with respect to a claim of discrimination based on the reassignment.

In Raspardo v. Carlone, 770 F.3d 97 (2d Cir. 2014), the Second Circuit articulated the relevant standard:

> A similarly situated employee is one 'similarly situated in all material respects; to the plaintiff. This does not mean that the plaintiff and the compared co-employees must be identical. In the context of employee discipline, however, the plaintiff and the similarly situated employee must have 'engaged in comparable conduct,' that is, conduct of 'comparable seriousness.'

Id. at 26 (citations omitted).

Applying that standard here, there is no evidence that Athawes or Usbeck engaged in any improper conduct that rose to the level of the conduct alleged in the notice of discipline. Jeunes v. Potter, 382 F. App'x 2, 4 (2d Cir. 2010)("Jeunes points to no evidence establishing that Nichols's disciplinary history was comparable to his own."). Thus, on this record, no reasonable factfinder could conclude that the Plaintiff and Athawes or Usbeck were "similarly situated." Accordingly, the Court finds that the Plaintiff fails to state a *prima facie* claim of discrimination under Section 1983, 1981, and the NYSHRL with respect to his reassignment.

Turning to the issue of sick leave, the Court notes that "requiring [a] Plaintiff to supply medical documentation for sick leave is not an adverse employment action where Plaintiff has not alleged that he was prevented from using his sick leave or that his terms of employment were altered because of the documentation requirement." Sethi v. Narod, 12 F. Supp. 3d 505, 2014 WL 1343069 (E.D.N.Y. Apr. 2, 2014); Pierre v. Napolitano, 958 F. Supp. 2d 461, 479 (S.D.N.Y. 2013)("requiring an employee to provide medical documentation is not a materially adverse action")(alteration and citations omitted); Solomon v. Southampton Union Free Sch. Dist., No. 08–CV–4822 (SJF)(ARL), 2011 WL 3877078, at *8 (E.D.N.Y. Sept. 1, 2011)(requiring plaintiff to submit a doctor's note for sick leave does not materially change the terms of her employment

such that it constitutes an adverse employment action), aff'd, 504 Fed. Appx. 60 (2d Cir. 2012); Blake v. Potter, No. 03–CV–7733 (LAP), 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007) ("[N]o reasonable fact-finder could conclude that Plaintiff was subject to 'adverse employment actions' as a result of being asked to provide a doctor's note in connection with a request for sick leave. . . . [C]ourts in this District have held that an employer's request for documentation in connection with medical leave does not constitute such an 'adverse employment action.'")(citation omitted), aff'd, 330 Fed. Appx. 232 (2d Cir. 2009).  Therefore, the mere fact that the Defendants may have required him to provide medical information to substantiate his requests for sick leave does not, without more, constitute an "adverse employment action."

However, where, as here, there is evidence that the requirement to provide the medical information was not conducted with proper "medical notice," as defined by the CBA, until at least May 18, 2012, the requirement to provide the medical information could be an "adverse employment action."  Further, the fact that the Plaintiff was apparently prevented from using his sick leave may constitute an "adverse employment action." Krishnapillai v. Donahoe, No. 09-CV-1022 (NGG)(SMG), 2013 WL 5423724, at *13 (E.D.N.Y. Sept. 26, 2013)("[G]iven the significant effects of denying an employee the use of paid sick time or administrative leave during a medical absence, the court finds that this is sufficient to establish an adverse employment action."); Delaney v. LaHood, 07–CV–471 (JG)(WDW), 2009 U.S. Dist. LEXIS 91293, at *63, 2009 WL 3199687 (E.D.N.Y. Sept. 30, 2009)(denial of sick leave may constitute an "adverse employment action").

However, the Court finds that the Plaintiff has failed to discharge his *prima facie* burden of showing an inference of discrimination on the basis of race or color related to the denial of sick leave and the requirement to provide medical information.  This is because the summary

judgment record indicates that Athawes and Usbeck were not "similarly situated" "in all material respects" – that is because neither of them made nearly the number of requests for sick leave that the Plaintiff did.  For the same reason, with regard to the request for medical documentation, even if in violation of DEC policy, the Court finds that there is no inference of discrimination on the basis of race or color.

The Plaintiff makes much of the fact that during his employment with DEC, Athawes and Usbeck took substantial periods of vacation time without scrutiny.  However, even under the Plaintiff's calculations, the Plaintiff's total hours missed exceeded that of Athawes by almost 200 and that of Usbeck by about 100 hours. (Combined Rule 56.1 Statement, at ¶ 254.)

The Court next considers the denial to the Plaintiff of his *per diem* allowances/reimbursements for certain meals and lodging.  First, the Court finds that Plaintiff has overcome his *prima facie* burden of proving an "adverse employment action."  Indeed, there is no reason to think that these reimbursements were not an entitlement, and without some quantification of the money involved, that the denial of these reimbursements was not an "adverse employment action."  Second, there is a genuine issue of material fact as to whether Athawes and Usbeck, both white, were "similarly situated" to the Plaintiff with respect to these denied reimbursements and whether their expense reports were granted or rejected.

Having satisfied his *prima facie* burden of showing discrimination on the basis of race and color with respect to reimbursements for certain meals and lodging, the Defendants must show that they had a legitimate, non-discriminatory reason for denying the Plaintiff's requests.  However, the Defendants have failed to do so.  The Defendants' contention that some of these requests were untimely is belied by DEC policy that does not have a time limit for credit card transactions.  The Court also takes note of an August 2, 2012 email from Cadrette to Flynn,

Hastback, and Lapinski acknowledging an obligation to fulfill some of those reimbursements and surmising that the Plaintiff was "being disciplined for the failures to get anything accomplished." (Combined Rule 56.1 Statement, at ¶ 4.)

It may well be that that certain of the Plaintiff's reimbursement requests were being denied solely due to poor work performance. If so, the Plaintiff would not have an actionable claim under Sections 1983, 1981, and the NYSHRL; rather, any rights the Plaintiff might have would depend on DEC policy and the terms of the CBA. However, at this stage of the litigation and with the Defendants having failed to articulate a non-discriminatory reason for the denial of these reimbursements, the Court is not prepared to conclude that no reasonable jury could find in favor of the Plaintiff on this aspect of his discrimination claim based on race and color.

In addition, it is unclear whether the alleged failure of the Defendants' to refer the Plaintiff's complaints of mistreatment, though none mentioned race or color, to the OAA may be an "adverse employment action." In any case, as explained below, even assuming this failure constituted an "adverse employment action," there is no genuine issue of material fact as to whether this occurred under circumstances giving rise to an inference of discrimination on the basis of race or color. Compare Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010)("an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint) with id. at 722 ("We do not mean to suggest that failure to investigate a complaint cannot ever be considered an adverse employment action for purposes of a retaliation claim.")

The Court further finds that the referral to the IG's office does not constitute an "adverse employment action" as the terms or conditions of his employment, then with A&M, were not materially and detrimentally altered.

Inasmuch as the Plaintiff cites to employment actions taken by DEC or the Defendants not previously addressed in this opinion, the Court finds that none of them constituted an "adverse employment action" considered individually. Also, in any event, none occurred under circumstances giving rise to an inference of discrimination on the basis of race or color.

### 3. Alleged Adverse Employment Actions Considered Collectively

In the alternative, the Plaintiff advances what some courts label the "atmosphere" theory of adverse employment action, arguing that the alleged employment actions taken against him may collectively be sufficient to establish an "adverse employment action."

"It is not clear whether state and federal antidiscrimination laws permit the Court to aggregate individual discrete acts to attempt to satisfy the 'adverse employment action' prong of [the] Plaintiff's *prima facie* case." Bowen–Hooks v. City of New York, 13 F. Supp. 2d 179, 211 n. 20 (E.D.N.Y. Mar. 31, 2014)(italics added). Some courts have expressly rejected this approach. See Kaur v. N.Y.C. Health & Hospitals Corp., 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010)("It should also be noted that there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); Figueroa v. New York Health & Hospitals Corp., 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007)("Plaintiff cites no case law, and this Court is aware of none, which supports the proposition that we are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim, as plaintiff alleges here."); Hill v. Rayboy–Brauestein, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006)

40

("Although . . . Title VII hostile work environment claims and retaliation claims involve different findings regarding adverse employment actions, the Plaintiff cites no law, and the Court is aware of none, that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim."); see Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528 (MKB), 2014 WL 4773975, at *7 (E.D.N.Y. Sept. 24, 2014)(collecting cases).

Others have adopted this approach, allowing plaintiffs to show that they suffered from an "atmosphere" of adverse employment actions, by which "a combination of seemingly minor incidents" constitute an adverse employment action "once they reach a critical mass." Rooney v. Brown Group Retail, Inc., No. 08 CV 484(DRH)(AKT), 2011 WL 1303361, at *16 (E.D.N.Y. 2011)(quoting Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)(applying an "atmosphere" of adverse acts analysis in the Title VII context). This requires showing that "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." Phillips, 278 F.3d at 109.

In an unpublished summary order, the Second Circuit has suggested that such an argument is cognizable under Title VII. See Cunningham v. N.Y.S. Dep't of Labor, 326 F. App'x 617, 619 (2d Cir. 2009)(addressing a "litany of actions" including "unfounded charges of time abuse," reassignment of offices, discontinuing a training conference organized by plaintiff, and excluding plaintiff from a conference and a hiring decision that, "according to plaintiff, constitute adverse employment action when 'considered in their totality,' and finding that "plaintiffs allegations are — each and together — nothing more than everyday workplace grievances" and not an adverse employment action for purposes of employment discrimination

claim)(citing <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000); <u>see</u>

<u>Moskowitz v. Coscette</u>, 3 F. App'x 1, 5 (2d Cir. 2001)(summary order)(combination of

disciplinary proceedings, assignment to desk duty, negative evaluations, and denial of promotion

were sufficient basis for jury to find an adverse employment action).  "The key inquiry remains,

however, whether that combination changed the terms of a plaintiff's employment." <u>Mento</u>, 2012

WL 1908920, at *8.

"The difference between a 'hostile work environment' and an 'atmosphere of adverse

employment action' eludes" the Court. <u>Asanjarani v. City of New York</u>, No. 09 CIV. 7493

(JCF), 2011 WL 4343687, at *11 n. 9 (S.D.N.Y. Aug. 18, 2011).  In any event, the Court need

not reach the question of whether the "atmosphere" of adverse acts analysis applies to a claim

under Section 1983, 1981, and the NYSHRL.  This is because, even if an aggregation of acts

could qualify as an "adverse employment action," the Plaintiff fails to set forth a *prima facie*

case of discrimination because nothing in the record supports an inference of discrimination on

the basis of race or color. <u>Setelius</u>, 2014 WL 4773975 at *7 ("However, even assuming that the

Court can consider the aggregate of individually non-adverse actions in determining whether

Plaintiff suffered an adverse employment action for purposes of her Title VII or her NYSHRL

claim, the aggregate of the actions alleged by Plaintiff do not amount to a materially adverse

employment action."); <u>Bowen-Hooks</u>, 13 F. Supp. at 211 n. 20 ("However, the Court need not

decide this issue since whether considered individually or in the aggregate, Plaintiff has not

shown that she suffered any adverse employment action."); <u>Weinstein v. Garden City Union Free</u>

<u>Sch. Dist.</u>, No. CV 11-2509 (AKT), 2013 WL 5507153, at *27 (E.D.N.Y. Sept. 30, 2013)("In

either event, even taken together, the foregoing alleged adverse actions are *de minimis* and are

far from reaching a 'critical mass' even if taken collectively.")(italics added); <u>Aspilaire v. Wyeth</u>

Pharm., Inc., 612 F. Supp. 2d 289, 305 (S.D.N.Y. 2009)("The Court need reach neither the question of whether the 'atmosphere of adverse acts' analysis applies to this case nor the question of whether plaintiffs assignment to work as an operator, when combined with the only timely adverse act alleged (the denial of plaintiff's application to be an administrative assistant), reaches the level of a 'critical mass.' This is because, even if an aggregation of acts could render plaintiff's shift claim to be adverse, plaintiff still fails to set forth a prima facie case of discrimination because nothing in the record supports an inference of discrimination therefrom.").

D. The Hostile Work Environment Claim

The Plaintiff also alleges that the Defendants caused or perpetuated a hostile work environment on the basis of race and color in violation of Section 1983, 1981, and the NYSHRL.

The standard for showing a hostile work environment under Section 1981 and the NYSHRL is essentially the same. See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 19 n. 4 (2d Cir. 2014)("The same standards apply to the plaintiffs' hostile environment claims arising under the NYSHRL, and to their claims arising under 42 U.S.C. § 1981.")(citations omitted).

In general, to prevail on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)(internal quotations omitted)(superseded by statute on other grounds, Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85). While single incidents of harassment generally do not create a hostile work environment, a plaintiff may nevertheless avoid summary judgment in a case involving a single instance of harassment

by showing that it was "extraordinarily severe." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000)(quoting Cruz, 202 F.3d at 570).

Furthermore, an adverse employment action is not required to sustain a hostile work environment claim. See Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001)("Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analy[zes] a workplace environment as a whole."); cf. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)(no demonstration of "injury" required for a hostile work environment claim).

Here, the Court concludes that the Plaintiff has failed to present sufficient evidence of the presence of a hostile work environment directed at him on the basis of race or color. The Plaintiffs admits that neither the Defendants nor anybody else at DEC made any derogatory comments to him or about him, or physically threatened him.

While actions that are racially neutral on their face can be considered in assessing the totality of the circumstances for a hostile work environment claim, there must be "'some circumstantial or other basis for inferring that [such] incidents . . . were in fact discriminatory.'" Lioi v. New York City Dept. of Health and Mental Hygiene, 914 F. Supp. 2d 567, 591 (S.D.N.Y. 2012)(quoting Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002)); cf. Moll v. Telesector Res. Grp., Inc., Nos. 12–4688, 13–0918–cv, —— F. Supp. 2d ——, ——, 2014 WL 3673357, at *4 (2d Cir. July 24, 2014)("The district court should have considered all incidents in their totality — including sex-neutral incidents — before it dismissed [plaintiff's] hostile work environment claims for failure to allege an actionable incident within the applicable statute of limitations.").

The above-described conduct, though varied in nature, does not rise to the level of severe or pervasive mistreatment so as to constitute a hostile work environment on the basis of race or

color. <u>Parekh v. Swissport Cargo Servs., Inc.</u>, No. 08–CV–1994 (CPS), 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009)(granting motion to dismiss hostile work environment claim where "[p]laintiff's complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination contain no suggestion of hostility or offensiveness"). Further, the Plaintiff ignores the fact that the Defendants' connection to certain of the above-described incidents, such as the "Interrogation," is attenuated at best. For these reasons, the Court grants that part of the Defendants' motion to dismiss the Plaintiff's hostile work environment claim.

E. Retaliation

The Plaintiff's retaliation claims under Section 1983, 1981, and the NYSHRL are also evaluated under the <u>McDonnell Douglas</u> framework. <u>Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.</u>, No. 13-4164-CV, 2014 WL 4958166, at *5 (2d Cir. Oct. 6, 2014); <u>Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.</u>, 716 F.3d 10, 14 (2d Cir. 2013)(NYSHRL); <u>Fincher v. Depository Trust & Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010)(§ 1981).

"In order to establish a *prima facie* case of retaliation, a plaintiff must establish [that] '(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity.'" <u>Batchelor v. City of New York</u>, No. 11-CV-2058 (MKB), 2014 WL 1338299 (E.D.N.Y. Apr. 1, 2014)(italics added)(quoting <u>Kelly</u>, 716 F.3d at 14).

In this case, even though the prosecution of the OGS Action likely constituted a protected activity, the Plaintiff's claim that the Defendants retaliated against him for bringing the suit fails

because there is no evidence that any of the Defendants, or, for that matter, any individual at DEC, "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [Section 1981 and the NYSHRL]." Kelly, 716 F.3d at 15.

In this regard, aside from telling Ritchie that he had a "complaint against the State," the Plaintiff did not provide any further information about the OGS Action to the Defendants, even though "[t]he onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." Early v. Wyeth Pharm., Inc., 603 F. Supp. 2d 556, 576 (S.D.N.Y. 2009); see also Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009)("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity.")(citation omitted)(citing Dinice–Allen v. Yale–New Haven Hosp., No. 06 Civ. 00675 (PCD), 2008 U.S. Dist. LEXIS 1802, 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008)).

Also unavailing is the Plaintiff's attempt to transform the Ritchie comment to the Plaintiff to "Sue me," uttered in the context of the change in his evaluation dates, into knowledge on the part of Ritchie of his earlier lawsuit, let alone that the suit was based on any protected characteristic.

The same failure to put the Defendants on notice is fatal to any claim of retaliation based on the Plaintiff's various oral and written complaints to his superiors at DEC. Nothing in the record regarding these complaints made reference to race, color, or national origin. Indeed, it was not until the Plaintiff submitted his letter of resignation to DEC that it became clear that he was complaining about conduct protected by employment discrimination statutes. However, as

previously discussed, no "adverse employment action" was taken against the Plaintiff after his resignation.

This is so even considered in light of the lower standard of adverse action applied to retaliation claims as opposed to that applied to substantive discrimination claims. <u>Benedith</u>, 2014 WL 4056554, at *40 ("the Supreme Court [has] held that a plaintiff asserting a retaliation claim need not show adverse conduct which affects the terms and conditions of employment. Rather, it is sufficient to show conduct which might have dissuaded a reasonable worker from making or supporting a charge of discrimination.")(citing <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006))

Accordingly, the Court grants that part of the Defendants' motion to dismiss the Plaintiff's claim of retaliation in violation of Section 1981 and the NYSHRL.

## III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part.

The Court denies the Defendants' motion as to the Plaintiff's substantive discrimination claim against the Defendants in their personal capacities based on the Defendants' denial of *per diem* allowances and reimbursements for certain food and lodging as allegedly violative of prohibitions against race and color discrimination provided for by Section 1983, 1981 and the NYSHRL. The Defendants' motion for summary judgment is otherwise granted.

The Court notes that, at the trial, although the Plaintiff may be able to present evidence of other alleged instances of discrimination as probative of discriminatory intent with regard to the denial of *per diem* allowances and reimbursements for certain food and lodging, the Plaintiff's recovery, if any, will be limited to damages arising from those denials.

As this opinion leaves a claim pending while no doubt substantially limits the potential scope of the Plaintiff's recovery, if any, the Court anticipates that the Plaintiff may wish for the Court to certify an interlocutory appeal under 28 U.S.C. § 1292(b).  To avoid needless motion practice, the Court considers this issue *sua sponte*.

"Certification [under 28 U.S.C. § 1292(b)] requires 'exceptional circumstances justifying a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" Gramercy Advisors, LLC v. Coe, No. 13-CV-9069 (VEC), 2014 WL 5847442, at *4 (S.D.N.Y. Nov. 12, 2014)(quoting Transp. Workers Union of Am., Local 100, AFL–CIO v. New York City Transit Auth., 505 F.3d 226, 229 (2d Cir. 2007)).  However, the only apparent prejudice that would result from requiring the Plaintiff to litigate this action until entry of a final judgment is the cost of litigation.  This is not, in itself, a sufficient basis to certify an otherwise-unexceptional order.  "Generally, such added delay and expense cannot justify an interlocutory [appeal] except in "'big' cases, in which it is expected that prolonged pretrial and protracted trial efforts will follow the disputed ruling.'" In re Lehman Bros. Holdings Inc., No. 13–CV–2211 (RJS), 2014 WL 3408574, at *3 (S.D.N.Y. June 30, 2014))(quoting 16 Charles Alan Wright et al., Federal Practice and Procedure § 3929 (3d ed.)).  It is not expected that this case would involve prolonged pretrial and protracted trial efforts and would not be a "big case" for the purposes of Section 1292(b), particularly given that discovery has concluded.  Accordingly, the Court *sua sponte* declines to certify this opinion for an interlocutory appeal under Section 1292(b).

**SO ORDERED.**
Dated: Central Islip, New York
December 8, 2014

_Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge